


FILED

Jul 23 2025, 9:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Quadir Quiroz,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

---

July 23, 2025

Court of Appeals Case No.
24A-CR-2649

Appeal from the
St. Joseph Superior Court

The Honorable
David Francisco, Judge

Trial Court Cause No.
71D02-2308-MR-15

**Opinion by Senior Judge Najam**
Judges Bailey and Scheele concur.

**Najam, Senior Judge.**

# Statement of the Case

[1] Quadir Quiroz appeals from his conviction of murder and raises the following issue for our review: whether the trial court abused its discretion by declaring a witness unavailable under Evidence Rule 804(a)(3) and 804(b)(5). We conclude that there is no abuse of discretion and, therefore, affirm.

# Facts and Procedural History

[2] On the evening of October 13, 2021, Ashanti Hines drove a vehicle in which Camyla Walton, Michael Cole, and her sister Kahlayia were passengers to Michael's aunt's house on Yukon Street in Elkhart. After they arrived, they sat in the car for a few minutes. As they waited, around six shots were fired at the vehicle, everyone in the car ducked for cover, and then the shots stopped. Kahlayia called the police, who had also received a notification from ShotSpotter[1] of possible gunshots in the area. A neighbor saw a silver sedan speeding down the alley immediately after he heard the gunshots.

---

[1] ShotSpotter is a device that monitors for gunshots and dispatches officers to the area where gunshots are detected. Tr. Vol. II, pp. 59-60.

[3]     Detective Brett Airy responded to the ShotSpotter notification and observed that Ashanti had sustained a gunshot wound to the right side of her head and was slumped over in the driver's seat. She died from those injuries. Responding officers combed the scene and recovered fired bullet casings located around the home.

[4]     That same day, Quiroz was at a home on Cleveland Avenue in South Bend. He left the home in a Chevy Malibu, and when he returned later, he told a resident that he had been involved in a shootout. At around 2:00 a.m. on October 14, police officers pursued a silver Chevy Malibu. Officers ultimately found the vehicle parked at a home on Cleveland Avenue. Officers recovered Facebook messages from Quiroz in which he stated that he took the vehicle on a high-speed chase.

[5]     Meanwhile, law enforcement officers with the South Bend Police Department Strategic Focus Unit conducted surveillance of the home on Cleveland Avenue for matters unrelated to the homicide. They observed Quiroz at the home, standing on the front porch and holding a firearm. Officers were aware that he had an outstanding warrant for his arrest. By the time officers surrounded the home, Quiroz had returned indoors. The officers instructed the occupants to come outside. Four people immediately complied, including Tavian Logan.

[6]     When Quiroz eventually came outside, he had insulation in his hair and on his shirt. Officers obtained a warrant to search the home and discovered the access point to the attic was broken. They found a Glock firearm in a pile of clothes

below the access point. A firearm examiner determined that some of the fired casings found around the Yukon Street home were fired from the Glock. There was "very strong support" for the inclusion of Quiroz's DNA on the Glock and magazine. Tr. Vol. III, p. 131.

[7] Detective Airy interviewed Tavian Logan, who was also known as Brazo, and videotaped the interview. In his interview, Logan told Detective Airy that Quiroz had killed Ashanti. He knew that Quiroz had used a silver vehicle to take his girlfriend to a place on Yukon Street the night Ashanti died. Quiroz's plan was to shoot someone named Michael. Logan heard Quiroz and another person argue about which of them killed Ashanti. Logan believed it was Quiroz who had killed her because he wanted to sell his gun. And Quiroz's girlfriend told Logan's girlfriend that Quiroz had shot someone. The State charged Quiroz with Ashanti's murder.

[8] The trial court admonished Quiroz's girlfriend, Natilie Haynes, not to have any communications with any potential witnesses in the case, including Quiroz. While incarcerated awaiting trial, Quiroz was placed in a cell with Prince Herron. Logan was incarcerated in the same pod as Deonte Lofton, who was also known as Chop. Quiroz used Herron's inmate identification to text others. The nicknames were used in the text messages.

[9] Lofton contacted Haynes from the jail. Lofton asked Haynes if she knew someone named Brazo and if Brazo was supposed to be testifying against Quiroz. Haynes replied that she did and that he was a rat, meaning an

informant. Lofton instructed Haynes to seek clarification from Quiroz about whether he should beat up Logan. Quiroz responded to Haynes that he wanted Lofton to beat Logan up because he was going to testify against him. Ex. Vol. V, p. 220 (State's Ex. 402); Tr. Vol. II, p. 122. Haynes relayed the message to Lofton.

[10] A few minutes later, another person in the prison texted Haynes to let her know that Logan was going to testify against Quiroz. Next, Haynes copied a text message from Lofton to the effect that Logan had escaped from him and that he could not beat him up and sent that copied message to Quiroz.

[11] Jail surveillance video showed Logan entering the dayroom area of his pod, and Lofton showing a message on his phone to Logan. A detective testified that it appeared that "Lofton was getting a little amped up[.]" Tr. Vol. III, p. 49. Logan immediately used the jail intercom system and asked to be locked down. Logan told jail staff that there were people in the jail who "wanted to jump on him" and that he needed to be "moved somewhere else" because he was in fear. *Id.* at 49-50.

[12] The next day, the State presented the trial court with allegations of efforts by Quiroz, or others acting on his behalf, to contact witnesses and to threaten them not to testify. Logan refused to come to court and told Detective Airy that if he testified he would be killed upon returning to prison. Tr. Vol. II, p.116. During a video conference call, the trial court ordered Logan to appear and informed him he would be held in contempt if he refused. When the trial court asked

Logan if he was going to appear, he relented, acknowledging he had no other choice.

[13] Logan appeared at a "forfeiture by wrongdoing hearing" held outside the jury's presence. *Id.* at 96. When questioned, Logan asserted his Fifth Amendment privilege. After the State granted him use immunity, he denied knowing Quiroz, responded that he would not give truthful answers to questions about Ashanti's murder, and said he had lied during his prior statement to police.

[14] When questioned by the court, Logan responded that he would answer the State's questions. After the State asked if he knew Quiroz, Logan answered that he did and that Quiroz was his brother. And Logan replied that he did not remember if he was there at the Cleveland Street house on the night of Ashanti's murder. He further testified that he did not remember: (1) who was with him; (2) the day of the murder; (3) Quiroz talking about a shootout; (4) who was at the house when the police served the warrant; (5) who his girlfriend was; or (6) seeing Quiroz or another person with a firearm.

[15] The State asked the court to find Logan unavailable as a witness. The court took the matter under advisement and ordered Logan to be returned to the jail.

[16] That night, Logan made two phone calls in which he recounted testifying to a lack of memory at the hearing and questioned how the State was aware of the

content of chirps,[2] or text messages from prison. The trial court determined that Logan was unavailable as a witness and that his unavailability was caused by Quiroz, thus forfeiting his right to confrontation of the hearsay statements. The trial court admitted Logan's videotaped interview with police into evidence over Quiroz's objection. And a jury found Quiroz guilty as charged.

## Discussion and Decision

[17] Quiroz appeals and asks us to find that the court erred by determining that Logan was unavailable as a witness and that error harmed his substantial rights. We begin our analysis by acknowledging our well-settled standard of review. "A trial court has broad discretion to rule on the admissibility of evidence, and we review the trial court's evidentiary decisions only for an abuse of that discretion." *Taylor v. State*, 223 N.E.3d 260, 264 (Ind. Ct. App. 2023). "A trial court abuses its discretion when its evidentiary decision is clearly against the logic and effect of the facts and circumstances before the court, and we will reverse only when the error affects a party's substantial rights." *Id.*

[18] The Confrontation Clause of the Sixth Amendment to the United States Constitution provides in pertinent part that "in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." This right allows the admission of an absent witness's out of court statement only if the witness is unavailable, and the defendant has had a chance to cross

---

[2] Chirps are "electronic communications from the jail[.]" Tr. Vol. II, p. 108.

examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). An exception to the right, however, exists when the defendant's "own wrongdoing caused the declarant to be unavailable to testify at trial." *Scott v. State*, 139 N.E.3d 1148, 1153 (Ind. Ct. App. 2020), *trans. denied*; *see also Crawford*, 541 U.S. at 62. This exception, known as the "forfeiture by wrongdoing doctrine," is designed to protect the integrity of the judicial process, and when a defendant attempts to undermine that process by procuring or coercing silence from witnesses, the Sixth Amendment right to confrontation may be forfeited. *Davis v. Washington*, 547 U.S. 813, 833 (2006).

[19] For a defendant to have forfeited his confrontation rights by wrongdoing, "the defendant must have had in mind the particular purpose of making the witness unavailable." *Scott*, 139 N.E.3d at 1154. The State bears the burden of showing by a preponderance of the evidence that the defendant forfeited his right to confrontation under this theory. *Davis*, 547 U.S. at 833. We consider evidence from the forfeiture hearing and the trial to independently assess whether the State met its burden. *See Scott*, 139 N.E.3d at 1154. Thus, the first step of our analysis is to determine whether the trial court correctly found that Logan was unavailable as a witness. And the next, related step is to determine whether Logan's unavailability was the result of Quiroz's actions or those acting on his behalf.

[20] Logan's statements to Detective Airy during the taped interview are hearsay statements. Unless the Rules of Evidence allow for the admission of his videotaped statement based on the unavailability of his testimony at trial, there

could be a Confrontation Clause violation. Therefore, we turn to whether Logan's statement was admissible under the Rules of Evidence.

[21] "'Hearsay' means a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Evidence Rule 801(c). Evidence Rule 804(a)(3)'s hearsay exception allows the admission of statements when the declarant is unavailable as a witness. "A declarant is considered to be unavailable as a witness if the declarant . . . testifies to not remembering the subject matter[.]" *Id.*

[22] Quiroz asserts that Logan "actually testified in open court[,]" Appellant's Br. p. 11, which implies that Logan was available as a witness. But the fact that Logan appeared at a separate hearing and answered some questions does not mean that he was available as a witness at trial. Logan's testimony was given at a forfeiture hearing conducted for the trial court to determine his availability as a witness. Case law and the Rules of Evidence speak in terms of unavailability of the witness, but in every case the question presented is not whether the witness is physically present or capable of being located but whether the *witness's testimony* is available. Physical presence is but one factor among several to be considered by the trial court in determining whether the witness's testimony is unavailable for purposes of the Rule.

[23] Quiroz contends that there are no state court cases "addressing how much memory a witness must lack" to be unavailable under Rule 803(a)(3), "nor are

there prior decisions directly addressing whether the witness must genuinely lack memory as opposed to merely feigning it." Appellant's Br. 12. He offers several cases under Federal Rule of Evidence 804(a)(3)[3] he contends support his position that the State did not meet its burden of establishing by a preponderance of the evidence that Logan was unavailable as a witness. We see it differently.

[24] Logan indicated that he would not testify at the forfeiture hearing or the trial. The trial court then informed Logan that he could be held in contempt of court should he refuse to testify at the hearing. At the forfeiture hearing, Logan stated he would answer questions but then asserted his Fifth Amendment rights. The State responded by granting him use immunity. He then denied knowing Quiroz, responded that he would not give truthful answers to questions about Ashanti's murder, and said he had lied during his prior statement to police. Next, Logan responded that he would answer the State's questions. After the State asked if he knew Quiroz, Logan answered that he did and that Quiroz was his brother. And Logan replied that he did not remember if he was there at the Cleveland Street house on the night of Ashanti's murder. He further testified that he did not remember: (1) who was with him; (2) the day of the murder; (3) Quiroz talking about a shootout; (4) who was at the house when the

---

[3] The language of Federal Rule 804(a)(3) is identical to the language of Indiana Evidence Rule 803(a)(3).

police served the warrant; (5) who his girlfriend was; or (6) seeing Quiroz or another person with a firearm.

[25] Logan remembered neither the general subject matter nor the details of Ashanti's murder, that is, he professed to have no memory of the events to which his hearsay statements related. *Cf. N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1336 (5th Cir. 1986) (witness was not unavailable because he remembered the general subject matter but not the details of his out-of-court testimony). Thus, Logan's testimony was unavailable because he professed not to remember the "material portion of the subject matter" of his videotaped interview. *See McDonnell v. United States*, 742 F.2d 1143, 1155 (8th Circ. 1973); *see also U.S. v. Davis,* 551 F.2d 233, 235 (8th Cir. 1977) (witness is unavailable when he refers to "a lack of memory of the subject matter of the [hearsay] statement."); *U.S v. Hughes*, 411 F.2d 461, 466 (2d Cir. 1969) (prior testimony of witness allowed in second trial because witness was schizophrenic and "claimed lapse of memory"). Thus, a witness is not available if he will not or cannot testify about the material portion of the subject matter of his out-of-court statement.

[26] The federal cases cited by Quiroz do not help his claim. As in every case, the trial court may take into account the credibility of the witness and, here, whether the witness has a bona fide lapse of memory or is motivated or compelled to profess a lapse of memory because he has been threatened or is otherwise afraid to testify. Those are some of several factors to be considered by the court when determining whether a witness's testimony is unavailable

under Evidence Rule 804(a)(3). And the numerous scenarios which may bring about the unavailability of the witness's testimony are exactly why that determination is reviewable for an abuse of discretion. There is no bright line rule to quantify a sufficient lack of memory or whether a professed lack of memory is bona fide.

[27] Having determined that Logan was an unavailable witness, Evidence Rule 804(b)(5) provides another exception to the hearsay rule, which applies here. The Rule provides for the admissibility of:

> A statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness for the purpose of preventing the declarant from attending or testifying.

The Rule incorporates the forfeiture by wrongdoing doctrine.

[28] The trial court held a video conference with Logan, who was incarcerated. Logan told the court that he would not testify against Quiroz. Logan agreed to testify during the hearing only after the trial court informed Logan he would be held in contempt of court if he did not testify. Once at the hearing, Logan asserted his Fifth Amendment privilege. The State then offered Logan use immunity. Next, Logan testified that he did not know Quiroz and that he would not truthfully answer the State's questions. And he said his prior statement to Detective Airy was untruthful.

[29] After questions from the court, Logan stated he would answer truthfully. He denied all of the material portions of his prior statement to Detective Airy. He did not remember if he was present at the Cleveland Street house on the night of Ashanti's murder. And, as we have noted, he further testified that he did not remember some six material portions of his videotaped interview.

[30] Detective Airy testified about his review of chirps that came from Quiroz's cellmate's number, Lofton's number, and Haynes' telephone number about plans to beat up Logan because he was scheduled to testify against Quiroz. And video from the prison depicted Lofton showing Logan something on his phone while getting "amped up." Tr. Vol. III, p. 49. Logan immediately thereafter asked to be placed in lockdown in his cell. Here, the State clearly established that Logan did not remember or professed not to remember the material portion of the subject matter of his statement and that Logan's silence was brought about by Quiroz's actions or by others acting on his behalf.

[31] The State has met its burden. There is an adequate factual basis in the record to support the trial court's conclusion that Quiroz procured the unavailability of Logan as a witness for the purpose of preventing him from testifying. Thus, we find no abuse of discretion in the admission of Logan's recorded statements to Detective Airy.

# Conclusion

[32] We affirm the trial court's determination that Logan's testimony was unavailable and that his testimony's unavailability was brought about by Quiroz and/or others acting on his behalf.

[33] Affirmed.

Bailey, J., and Scheele, J., concur.

ATTORNEY FOR APPELLANT

A. Robert Masters
Nemeth, Feeney, Masters & Campiti, P.C.
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Alexandria N. Sons
Deputy Attorney General
Indianapolis, Indiana